IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

         Respondent,              No. CR S-93-0472 DLJ DAD

   vs.

FERENCE B. LANG,

         Movant.            <u>FINDINGS AND RECOMMENDATIONS</u>

_____/

       On April 24, 2000, movant, proceeding pro se, filed a motion pursuant to 28 U.S.C. § 2255. Counsel was appointed, and extensive litigation ensued. Upon careful consideration of the record and the applicable law, the undersigned recommends that movant's second amended § 2255 motion be denied.

**PROCEDURAL HISTORY**

       On November 12, 1993, Ference B. Lang and Britton G. Flemons were indicted on federal drug trafficking charges. In the proceedings that followed, defendant Lang was represented by attorneys Richard B. Mazer and David Z. Chesnoff. Defendant Flemons was represented by attorney Danny D. Brace, Jr. The case was prosecuted by Assistant United States Attorneys Mark Krotoski and D. Searles.

/////

On October 12, 1995, a superseding information was filed against defendant Flemons.  On the same date, defendant Flemons entered a plea of guilty to the charge of unlawful use of a communication facility for distribution of cocaine in violation of 21 U.S.C. § 843(b).[1]

On November 3, 1995, a superseding indictment was filed against defendant Lang.  He entered pleas of not guilty to all charges on November 7, 1995.  On March 15, 1996, a second superceding indictment was returned charging defendant Lang with possession of cocaine base found inside a Chevy Blazer parked in the garage of a residence at 2061 Hudson Street in Sacramento, California on November 3, 1993 with the intent to distribute it in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Count One), possession of cocaine base found inside a maroon GMC pickup truck near the residence located at 204 Cookingham Way located in Sacramento, California on November 3, 1993 with the intent to distribute it in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Count Two), and possession of cocaine base with the intent to distribute it between December 1992 and October 1993 in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Count Three).  On March 20, 1996, Lang entered pleas of not guilty to all three counts of the second superceding indictment

Jury trial commenced on April 29, 1996, before United States District Judge David F. Levi.  On May 8, 1996, following six days of trial, the jury found defendant Lang guilty of Count One, possession with intent to distribute cocaine base found on November 3, 1993 inside the defendant's Chevy Blazer parked in the garage of a residence at 2061 Hudson Street in Sacramento, California, in violation of 21 U.S.C. § 841(a)(1), and aiding and abetting, in violation of 18 U.S.C. § 2.  Lang was found not guilty on Counts Two and Three.

On May 29, 1996, defendant Lang, still represented by attorneys Mazer and Chesnoff, moved for a new trial on the ground that the trial court erred in admitting, under the

---

[1]  Defendant Flemons was ultimately sentenced on December 5, 1996, to 24 months of imprisonment and a 12 month term of supervised release, with a special assessment of $50.00 and a recommendation for placement in an Intensive Confinement Program.

2

doctrine of inevitable discovery, the evidence of cocaine base seized from defendant's Chevy Blazer on November 3, 1993.  Defendant Lang contended that false statements were made in the search warrant application concerning probable cause for searching the residence at 2061 Hudson Street, and he disputed that discovery of the evidence was inevitable.  On September 5, 1996, Judge Levi heard and denied the motion for new trial.  On October 10, 1996, defendant Lang was sentenced to 292 months of imprisonment and 60 months of supervised release, with a special assessment of $50.00.

Defendant Lang filed a timely notice of appeal in propria persona.  In March 1997, Jonathan D. Soglin was appointed to represent defendant Lang on appeal.  In a published order filed on July 21, 1998, the Ninth Circuit Court of Appeals rejected defendant Lang's claim that the trial court erred in denying his motion to suppress the evidence found in the cereal box hidden in his Chevy Blazer in the garage at 2061 Hudson Street.  United States v. Lang, 149 F.3d 1044 (9th Cir.), as amended by 157 F.3d 1161 (9th Cir. 1998).  In an unpublished memorandum decision filed concurrently with the published opinion, the Ninth Circuit affirmed defendant Lang's conviction, rejecting his claims of (1) trial court error in denying his motion to suppress evidence found inside the Hudson Street residence, (2) prosecutorial misconduct, (3) trial court error in determining the quantity of crack cocaine for sentencing purposes, and (4) trial court error in finding that the large quantity of cash seized pursuant to the investigation was the proceeds of drug trafficking.  United States v. Lang, No. 96-10464, 1998 WL 432223, at *1-2 (9th Cir. July 21, 1998).

Defendant Lang's appeal included a claim that his trial attorneys were constitutionally ineffective for failing to identify for the jury the location of eight unidentified fingerprints that were found on or within the cereal box hidden in his Chevy Blazer at the Hudson Street address.  The Ninth Circuit noted that ineffective-assistance-of-counsel claims are not usually addressed on direct appeal and concluded that defendant Lang's claim did not fall into an exception to the general rule because

3

1   the record is not sufficiently developed to permit meaningful
    review and it is not obviously apparent that Lang was denied his
2   Sixth Amendment right to counsel.  Therefore, we do not reach this
    claim, and Lang is free to assert it in a motion under 28 U.S.C.
3   § 2255.

4   1998 WL 432223, at *1.

5        Defendant Lang's petition for certiorari was denied by the United States Supreme

6   Court on May 24, 1999.

7        On April 24, 2000, Lang filed a pro se motion pursuant to 28 U.S.C. § 2255

8   seeking relief on the sole ground that he received ineffective assistance of trial counsel with

9   respect to unidentified fingerprints on and in the cereal box that led to his conviction.  The

10  motion was referred to the undersigned on May 1, 2000.  On July 3, 2000, the court requested

11  that the Federal Defender determine whether movant qualified for appointment of counsel and, if

12  so, to recommend counsel.  On September 26, 2000, pursuant to the Federal Defender's

13  advisements, Suzanne A. Luban, Esq. was appointed to represent movant in these proceedings

14  subject to contribution if later found appropriate.  (Order filed Sept. 26, 2000, at 1.)

15       The initial status conference set for October 27, 2000 was continued multiple

16  times by stipulation and order.  Pursuant to the first such stipulation and order, filed on

17  December 4, 2000, movant was granted leave to file an amended § 2255 motion.  In the first

18  amended § 2255 motion filed January 8, 2001, movant presented both his claim of ineffective

19  assistance of defense counsel and a new Brady claim.  Pursuant to a further stipulation and order

20  filed January 24, 2001, movant was granted leave to file a second amended § 2255 motion.  In

21  the second amended § 2255 motion filed February 5, 2001, which is the motion now before the

22  court for decision, movant alleges as Claim I that he was denied effective assistance of trial

23  counsel when his trial lawyers failed to present exculpatory evidence to the jury regarding latent

24  fingerprints.  Movant omitted the Brady claim previously alleged in the first amended motion and

25  added two new Apprendi claims as Claims II and III.

26  /////

4

1    On March 23, 2001, respondent moved to dismiss the second amended § 2255

2 motion.  The hearing of respondent's motion to dismiss was postponed several times at the

3 parties' request, and eventually the hearing was vacated altogether in order to permit counsel to

4 engage in settlement discussions.  The matter did not settle, and a status conference was held on

5 June 7, 2002.  The court granted movant's motion for leave to conduct discovery for a brief

6 period of time regarding the <u>Brady</u> claim that had been alleged in the first amended § 2255

7 motion.  Respondent's motion to dismiss was reinstated, and the undersigned filed findings and

8 recommendations on June 11, 2002, recommending that the two <u>Apprendi</u> claims be dismissed

9 and that respondent's motion be denied as to the ineffective-assistance-of-counsel claim.

10    On July 12, 2002, movant moved for leave to conduct additional discovery

11 regarding the <u>Brady</u> claim.  Hearing of the discovery motion was continued twice by stipulation

12 and order.  On October 15, 2002, the discovery motion was denied.  On the same date, Judge

13 Levi adopted the June 11, 2002 findings and recommendations, granted respondent's motion to

14 dismiss in part, and dismissed movant's <u>Apprendi</u> claims.

15    Movant filed a renewed discovery motion on November 20, 2002.  The motion

16 was continued several times at the parties' request and was denied after hearing on February 11,

17 2003.  On March 10, 2003, a schedule was set for further motions concerning expansion of the

18 record, waiver of attorney-client privilege, and discovery.  On June 16, 2003, the undersigned

19 heard respondent's May 5, 2003 motion for orders declaring a waiver of attorney-client privilege

20 and compelling disclosure of attorney-client communications, as well as movant's May 5, 2003

21 motion for protective order and May 7, 2003 motion to expand the record.  Respondent's motion

22 for an order declaring a waiver of the attorney-client privilege was granted with respect to the

23 issue of latent fingerprints and the defense theories and decisions pertaining to those latent

24 fingerprints.  Respondent's motion for discovery was granted.  Movant's motion for protective

25 order was granted, and a protective order was issued on July 3, 2003.  Movant's motion to

26 /////

expand the record was granted, and the record was expanded to include the declaration of David
Chesnoff.

A further status conference set for August 18, 2003, was continued twice at the
parties' request.  At the status conference held on October 1, 2003, Assistant United States
Attorney Samantha Spangler appeared and was substituted for Mark Krotoski as respondent's
attorney of record.  Deadlines were set for respondent's response to the remaining claim in the
second amended § 2255 motion and for movant's reply, with oral argument set for January 21,
2004.  These dates were modified several times at the parties' request.

Respondent's response was filed March 16, 2004, and movant's traverse was filed
April 29, 2004.  Upon hearing oral argument on May 21, 2004, the undersigned deemed
movant's second amended § 2255 motion submitted for decision.  However, on July 30, 2004,
movant sought reconsideration of the district judge's dismissal of his Apprendi claims.  After the
motion for reconsideration was briefed, Judge Levi took the motion for reconsideration under
submission on the papers without appearance and without argument.  On March 21, 2005, Judge
Levi denied the motion for reconsideration, whereupon the § 2255 motion stood submitted for
decision on movant's claim of ineffective assistance of counsel.

By order filed July 3, 2007, the case was reassigned from Judge Levi to Senior
Judge D. Lowell Jensen for all further proceedings.

On September 12, 2007, the Ninth Circuit issued an order denying without
prejudice a petition for writ of mandamus filed by movant in propria persona.  The order
provides that a new petition may be filed if the district court has not issued an order regarding the
petitioner's § 2255 motion within sixty days.

## ANALYSIS

I. Legal Standards

The Sixth Amendment guarantees criminal defendants the right to effective
assistance of counsel.  Strickland v. Washington, 466 U.S. 668, 686 (1984) (citing McMann v.

1  Richardson, 397 U.S. 759, 771 n.14 (1970)); United States v. Span, 75 F.3d 1383, 1386 (9th Cir.

2  1996).  Thus, under the Sixth Amendment a defendant is entitled to "a reasonably competent

3  attorney, whose advice is within the range of competence demanded of attorneys in criminal

4  cases." United States v. Cronic, 466 U.S. 648, 655 (1984) (internal quotations omitted).  The

5  purpose of the effective assistance guarantee is "to ensure that criminal defendants receive a fair

6  trial." Strickland, 466 U.S. at 689.  Toward that end, the Sixth Amendment requires that an

7  accused be assisted by an attorney "'who plays the role necessary to ensure that the trial is fair.'"

8  Frazer v. United States, 18 F.3d 778, 782 (9th Cir. 1994) (quoting Strickland, 466 U.S. at 685).

9          The United States Supreme Court set forth the test for demonstrating ineffective

10  assistance of counsel in Strickland v. Washington.  To support a claim of ineffective assistance

11  of counsel, a petitioner must first show that, considering all the circumstances, counsel's

12  performance fell below an objective standard of reasonableness.  Id. at 687-88.  After a petitioner

13  identifies the acts or omissions that are alleged not to have been the result of reasonable

14  professional judgment, the court must determine whether, in light of all the circumstances, the

15  identified acts or omissions were outside the wide range of professionally competent assistance.

16  Id. at 690; Wiggins v. Smith, 539 U.S. 510, 521 (2003).  Second, a petitioner must establish that

17  he was prejudiced by counsel's deficient performance.  Strickland, 466 U.S. at 687, 693-94.

18  Prejudice to the defense means that "counsel's errors were so serious as to deprive the defendant

19  of a fair trial, a trial whose result is reliable." Id. at 687.  Thus, prejudice is found where "there is

20  a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

21  would have been different." Id. at 694.  A reasonable probability is "a probability sufficient to

22  undermine confidence in the outcome." Id.  See also Williams v. Taylor, 529 U.S. 362, 391

23  (2000); Laboa v. Calderon, 224 F.3d 972, 981 (9th Cir. 2000).  A reviewing court "'need not

24  determine whether counsel's performance was deficient before examining the prejudice suffered

25  by the defendant as a result of the alleged deficiencies     . . . .  If it is easier to dispose of an

26  ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be

1 followed.'" <u>Pizzuto v. Arave</u>, 280 F.3d 949, 955 (9th Cir. 2002) (quoting <u>Strickland</u>, 466 U.S. at

2 697).

3       In assessing an ineffective assistance of counsel claim, "[t]here is a strong

4 presumption that counsel's performance falls within the 'wide range of professional assistance.'"

5 <u>Kimmelman v. Morrison</u>, 477 U.S. 365, 381 (1986) (citing <u>Strickland</u>, 466 U.S. at 689).  There is

6 in addition a strong presumption that counsel "exercised acceptable professional judgment in all

7 significant decisions made." <u>Hughes v. Borg</u>, 898 F.2d 695, 702 (9th Cir. 1990) (citing

8 <u>Strickland</u>, 466 U.S. at 689).

9 II.  <u>Factual Background</u>

10       The Ninth Circuit's published opinion affirming movant's conviction on appeal

11 sets forth the following facts:

12       Lang's conviction was based on crack cocaine found in a cereal
      box hidden inside the engine compartment of Lang's Blazer.  On
13       November 3, 1993, Sacramento Police Officer Brown and Special
      Agent McCain of the Bureau of Alcohol, Tobacco and Firearms
14       executed a search warrant on Lang's girlfriend's residence.  No one
      was home at the time, but Lang's Blazer was parked in the garage.
15

16       Shortly thereafter, Lang and his girlfriend arrived.  The agents
      placed Lang under arrest and searched him, finding, among other
17       things, keys to the Blazer.  Without advising Lang of his *Miranda*
      rights, Brown told Lang that if he did not reveal the location of the
18       narcotics, his girlfriend would also be arrested and their children
      would be sent to the Sacramento Children's Home.  Lang told
19       Brown that the narcotics were in the Blazer.  Brown searched the
      Blazer and found $8,550 in cash in the glove compartment, but did
20       not find any crack cocaine.  Brown allegedly reiterated his threat to
      arrest Lang's girlfriend, and Lang stated that the drugs were in a
21       box in the engine compartment.  McCain lifted the hood to the
      engine and saw the cereal box.  Inside the cereal box were three
22       large plastic bags, each containing numerous smaller plastic
      baggies.  Inside each smaller baggie was a piece of crack cocaine,
23       ranging from 5 grams to 24.5 grams.

24 149 F.3d at 1046.  Lang's statements were suppressed at trial because they were coerced.  <u>Id.</u> (as

25 amended by 157 F.3d at 1162).  The Ninth Circuit found the evidence regarding the drugs found

26 /////

1   in the cereal box in the Blazer was properly admitted at trial because the agents would have

2   discovered the cereal box even in the absence of Lang's statements.  Id.

3          The detailed background set forth in respondent's answer to the second amended

4   § 2255 motion provides additional context for this court's discussion of movant's § 2255 motion.

5   Respondent explains that Lang was identified in an investigation as a major rock cocaine dealer

6   in Sacramento, and Flemons was one of his associates.  (Response to Movant's Second Amended

7   § 2255 Mot. at 6.)  On November 3, 1993, a search warrant was served at three locations

8   frequented by Lang:  Lang's primary residence on La Almendra Way, his girlfriend's residence

9   on Hudson Street, and Flemons' lawn maintenance company on Cookingham Way, where Lang

10  worked.  (Id.)

11         At about 3:06 p.m. on November 3, 1993, the warrant was served at 2061 Hudson

12  Street, where Patricia Maddox, Lang's girlfriend and common law wife, resided with three

13  children, two of whom were Lang's.  No one was present when the officers arrived, but Lang's

14  locked Chevy Blazer was inside the garage.  (Id. (citing Reporter's Transcript on Appeal (RT) at

15  85, 87, 89, 92, 102-03, 112, 777, 800).)

16         At about 3:11 p.m., the warrant was served at 204 Cookingham Way,

17  approximately two and a half miles from the Hudson Street residence.  In early 1992, Britton

18  Flemons established Flemons Lawn and Maintenance Company, basing the business at his

19  father's residence at 204 Cookingham Way.  Lang worked for the company for about five days a

20  week from the summer of 1992 to November 3, 1993.  The Cookingham Way address had been

21  identified by law enforcement as a rock cocaine distribution point.  When the search warrant was

22  served at the Cookingham Way address on November 3, 1993, four individuals were present,

23  including Britton Flemons and another individual, who were in an orange/red Chevy pickup in

24  front of the residence.  A ziplock baggie containing marijuana was found in the Chevy pickup.

25  Officers found 1.2 grams of rock cocaine in a kitchen cabinet in the residence.  A glass tube and

26  baggies were found in a bedroom.  Flemons' fingerprints were later identified on the box of

9

sandwich bags and the glass tube found in the residence as well as on the ziplock baggie found in the Chevy pickup. (Response at 7-8 (citing RT at 79, 138, 140, 143, 169, 172, 187-88, 281, 284, 308, 343, 379, 633, 586-87, 793, 809).)

When the search warrant was served at 204 Cookingham Way, Lang's locked maroon GMC truck was parked near the residence. Officers searched the maroon truck and found, under the seat, two baggies containing rock cocaine with a net weight of 24.3 and 3.81 grams. About 18 inches away from the two baggies, on the passenger side of the truck, was a blue athletic bag that contained a pistol purchased by Lang in November 1991, a scale, a baggie with residue, and papers with Lang's name on them. A pager was in the ashtray, and Lang's wallet, which contained his driver's license and business cards, was in a door pouch. (Response at 8 (citing RT at 142, 144-45, 149-54, 156, 160, 162, 164, 188-89, 263, 306-08, 445, 454-55, 457, 528, 798-99).)

Lang and Patricia Maddox arrived at the Hudson Street residence at about 3:50 p.m. on November 3, 1993. Lang was arrested for the rock cocaine that had been found in his maroon truck. Upon searching Lang, officers found in one of his pockets a pager, $1,065, and a key for the locked Chevy Blazer parked in the garage at the Hudson Street residence. In another of Lang's pockets, officers found an additional $1,065. In one of Lang's socks, they found $175. Using the key found in Lang's pocket, officers unlocked the Chevy Blazer and backed it out of the garage. In the center console of the Blazer was a plastic bag containing $8,550. In the engine area of the Blazer, officers found a cereal box. Inside the cereal box, under newspaper, there were three large plastic bags. The three large plastic bags contained a total of 45 small plastic baggies subsequently determined to contain a combined total of 603.93 grams net weight of cocaine base. Eighteen of the small baggies contained a quarter ounce of cocaine base, eleven contained a half ounce, and sixteen contained a full ounce. Lang's left index fingerprint was later identified on one of the small baggies which held a full ounce of rock cocaine. (Response at 6-7 /////

1  (citing RT at 104-10, 114-17, 120-22, 133-34, 262-63, 305, 343, 564, 587-88, 722, 788, 798,
2  803).)

3      At about 5:00 p.m., Lang's two-story residence at 8173 La Almendra Way,
4  considered a "money house," was searched.  No one was present.  Dogs, a Rottweiler and a
5  Chow, were in the back yard.  On Lang's master bedroom night stand was a scanner tuned to a
6  channel used by narcotics officers, allowing the listener to hear police surveillance within a few-
7  mile radius.  In the top drawer of the night stand was a loaded assault-type pistol that Lang had
8  bought in 1992.  Next to the night stand was a loaded shotgun in a collapsible case.  Also in the
9  master bedroom was a pistol box that had the same serial number as the pistol found in Lang's
10  maroon truck.  In a metal lockbox were ownership papers and a repair receipt for the Chevy
11  Blazer, registration papers for the maroon pickup and two other vehicles, Lang's checkbook, and
12  furniture receipts.  There was more than $28,000 in cash in a computer desk and $2,304 in a
13  water bottle near the dresser in the master bedroom.  In a fenced area on the side of the house
14  was a doghouse that concealed a safe.  Inside the safe were two athletic bags containing more
15  cash, including $59,445 in one bag and $120,000 in the other.  (Response at 8-9 (citing RT at
16  289, 319-20, 445, 457, 459-60, 462-64, 466-73, 493-94, 527-31, 537-41, 545, 547-48, 583-84,
17  586, 631-32, 794-96, 807, 902).)

18      At trial, Flemons testified as follows:  he had known Lang since he (Flemons) was
19  about 11 years old; Flemons had a 1992 felony conviction for possessing cocaine for sale; he lied
20  to a probation officer in 1993 about using cocaine in an effort to get drug diversion; Flemons sold
21  about nine ounces of rock cocaine during 1993; Lang was Flemons' primary supplier; Lang
22  typically purchased kilo quantities of rock cocaine, while Flemons typically purchased a half
23  ounce or an ounce; Flemons saw Lang on the morning of November 3, 1993, and at about 2:00
24  p.m. that day he saw Lang's maroon truck near the residence at 204 Cookingham Way, parked
25  where Lang had parked it that morning; Flemons provided details of specific instances in which
26  Lang was involved with cocaine possession and distribution in 1992 and 1993.  (Response at 10-

1   11 (citing RT at 283, 299-310, 314-17, 320-34, 339, 347-51, 356-62, 365, 369, 371-72, 374-75,

2   379-81).)

3          The following evidence of Lang's unexplained wealth was presented at trial:

4   Lang, a 30-year-old gardener, had a substantial amount of cash on November 3, 1993; trial

5   stipulations established that almost half of the $219,088 possessed by Lang on that date was in

6   $20 bills; the large quantity of $20 bills was consistent with rock cocaine distribution and

7   inconsistent with large gambling winnings; Lang had season tickets to Sacramento Kings games;

8   Lang had taken Patricia Maddox on a cruise to Jamaica and Mexico; Lang's primary residence

9   had fairly new furniture; the residence had a sports room with sports memorabilia, an Italian

10  leather sofa and love seat purchased for $3,100, and a 50-inch television purchased for $3,700; in

11  addition to the Chevy Blazer and the maroon pickup, Lang had a 1972 Oldsmobile and a Jeep CJ

12  in excellent condition; prior to his gardening job, which involved cutting lawns about five days a

13  week, Lang worked as a bartender at TGI Friday's and briefly worked at loading and unloading

14  trucks; Lang had not filed federal income tax returns for 1988 through 1993; although Lang

15  contended that he made a lot of money as a gambler and Maddox testified that Lang liked to

16  gamble, there were no currency transaction reports issued to Lang by casinos to document large

17  winnings during the period 1988 through 1993; defense witnesses Chris Andrews and Everett

18  Butler could not substantiate any of Lang's gambling winnings or losses and admitted that large

19  winnings were usually paid in $100 bills; Flemons traveled with Lang to gamble two or three

20  times, and neither of them won any money on those occasions.  (Response at 11-15 (citing RT at

21  106-08, 110, 224, 284, 293, 341, 373-74, 462, 466, 529-31, 547, 532-34, 539-40, 554-55, 579-

22  80, 610-11, 661-62, 666, 669, 673-75, 680, 682, 691, 694-97, 780-81, 792-94, 799, 802, 805,

23  848, 850, 883-84).)

24         Defense witness Paul Balque, who was convicted in February 1995 of a

25  misdemeanor for writing bad checks, testified at the trial as follows:  he had known Lang for

26  about six years; he first saw Lang on November 3, 1993 when Lang arrived at work at around

7:30 or 8:00 a.m. in his maroon truck; Balque worked with Lang and Sonny Wilcox from about 8:00 a.m. to noon on November 3, 1993 using Lang's maroon truck and cutting lawns; around noon, Patricia Maddox came to get Lang at 204 Cookingham Way to go buy groceries; after Lang left with Maddox, Balque took the keys for Lang's maroon truck and continued to cut about four lawns with Sonny Wilcox; Balque was certain that at 1:30 p.m. he parked Lang's maroon truck between 208 and 212 Cookingham; Balque did not see any of the items later found in the maroon truck, such as plastic baggies, a scale, a gun, or a wallet; after parking Lang's truck, Balque took the keys, got on his bike, and went home; when he got home, his aunt called to tell him that his son had been detained at Cookingham; Balque left on his bike to return to Cookingham Way; on his way there, Balque saw Lang and Maddox walking out of the grocery store at about 2:55 p.m.; Balque told Lang that Flemons was being raided; Balque did not return Lang's truck keys because Lang asked him to bring the maroon truck to Lang's house; at about 3:35 p.m., Balque went to Cookingham Way to see his son; he did not tell any officer that he had the keys to the maroon truck or that he had driven that truck earlier; Balque still had the keys to the truck when he returned home around 4:30 or 5:00 p.m.; at about 8:30 or 9:00 p.m., Maddox came to Balque's place to retrieve the keys for the maroon truck.  (Response at 13-14 (citing RT at 708, 710-21, 723-26, 728-29, 731-34, 737-43, 745, 959).)

Balque's testimony was inconsistent with that of other witnesses in several respects:  Balque initially thought Lang's truck was blue and white; he did not recognize a photograph of the maroon truck, which had been identified by other witnesses; surveillance placed Lang's maroon truck on Cookingham Way at 1:00 p.m. rather than at 1:30 p.m.; three witnesses said the maroon truck was parked on the curb near 204 and 208 Cookingham Way, not between 208 and 212 Cookingham Way; Maddox testified that she saw Balque in the parking lot of the grocery store at 1:30 p.m., which was the time Balque said he was parking the maroon truck on Cookingham Way; the search at 204 Cookingham Way did not begin until 3:11 p.m., sixteen minutes after the time Balque said he told Lang that Flemons was being raided; Maddox

testified that she saw Balque only one time that day, in the parking lot of the store, rather than the three times described by Balque; Maddox testified that Balque returned the truck keys to Lang in the parking lot of the grocery store and she did not go to Balque's house; Flemons' records indicated that Balque did not work during the week of November 1, 1993.  (Response at 13-14 (citing RT at 138, 142, 221, 306-08, 454-55, 457, 705, 720-21, 788, 791-92, 809, 832-88).)

Patricia Maddox also testified at Lang's trial as follows:  she met Lang in 1987 and considered herself his wife; Lang is the father of two of her three children; Lang had been at the Hudson Street residence at about 7:30 a.m. on November 3, 1993, and they made plans to go grocery shopping that day; around noon, Maddox picked up Lang at 204 Cookingham Way in her car; she and Lang shopped for about an hour and a half at a store about two miles from the Hudson Street residence; at about 1:30 p.m., in the grocery store parking lot, she and Lang saw Rhonda and Paul Balque; Maddox saw Paul Balque hand Lang the keys to Lang's maroon truck; Maddox and Lang then went directly to the Hudson Street residence, arriving before 2:00 p.m.; Maddox saw Paul Balque only once that day and did not go to his residence.  (Response at 14-15 (citing RT at 775, 781-83, 787-92, 800, 803, 806, 808-09).)

Maddox's testimony was inconsistent with that of other witnesses in several respects:  Paul Balque denied returning the truck keys to Lang in the grocery store parking lot and testified that Maddox came to his house to get the keys in the evening; officers testified that Lang and Maddox arrived at the Hudson residence at 3:50 p.m. rather than before 2:00 p.m.  (Response at 15 (citing RT at 104, 717-18, 738, 740, 806).)

III.  <u>Movant's Claim</u>

Movant alleges that he was denied effective assistance of trial counsel when his attorneys failed to present exculpatory evidence to the jury regarding latent fingerprints.  (Second Amended § 2255 Mot. at 2.)  Movant presents the following statement of facts in support of his claim:

/////

Fingerprint technician Felita Chapman testified that she examined 72 exhibits pertaining to this case, and discovered a total of twelve latent prints.  Out of the twelve latent prints, Penny Hummell testified that she confirmed the identity of four latent prints.  Ms. Hummell matched one latent print to movant, which was found on a flap of one of the sandwich bags stored inside the Corn Flakes box.  Three latent prints found respectively on a ziploc baggie, a box of sandwich bags, and a test tube were all identified as belonging to Britton Flemons.

Ms. Hummell further testified that the eight remaining latent prints were negative as to both movant and Flemons, and belonged to persons not identified.

One of the unidentified latent prints was found on the Corn Flakes box and three unidentified latent prints were found on the newspaper used as packing material inside the Corn Flakes box. This evidence supported an important defense theory – i.e., that some third party working with Flemons stashed the drugs inside the Blazer.

The defense attorneys wanted the jury to hear that there were four prints found on and in the Corn Flakes Box which did not match Mr. Lang's prints.  On cross-examination of fingerprint technician Chapman, defense counsel David Chesnoff stumbled over questions and twice had to be reminded that Ms. Chapman was testifying as to where prints had been found, not whether they had been identified.  (Ms. Hummell, the next witness, was to testify as to the print comparisons.)  Defense counsel acknowledged "I'm doing a very bad job here."

Then on cross of Felita Chapman, defense attorney Chesnoff established that there were latent prints she did not identify. However, defense counsel failed to elicit from either fingerprint expert the <u>locations</u> of the four unidentified latents found on and in the Corn Flakes Box.

Further, when offered the opportunity to supplement the record on the locations of the fingerprints by stipulation, movant's trial lawyers neglected to include in the stipulation the locations of these four unidentified latent prints.  Therefore, the jury was never informed of the locations of the three unidentified prints found on

/////

/////

/////

/////

15

baggies inside the cereal box,[2] and the []one print found on the outside of the cereal box.

The jury itself queried whether any latent prints were found on the plastic bags inside the Corn Flakes box. The district court acknowledged that failure to make this clear to the jury was problematic, and the locations of the prints inside the cereal box "should have been covered in the testimony."

Defense counsel erroneously advised the court that the locations of the latent prints was itemized for the jury in prior testimony. The district court responded: "I don't think so . . . that's precisely what's missing here. For whatever reasons, that was not asked of the witness. . . ."

Defense counsel Chesnoff realized his failure to elicit the locations of the unidentified latent prints, and asked the district court if the defense could "get Ms. Chapman back."[3] The district court responded affirmatively, saying, "That's all right. If you [want] to bring her back, it's up to you."

Instead of calling Ms. Chapman a second time, the parties agreed to enter into a stipulation indicating inter alia where the unidentified latent prints were found. The district court explicitly instructed the lawyers "you should identify where the prints were taken from in your stipulation." However, contrary to its initial purpose, the stipulation did not identify where the unidentified latent fingerprints were found.

(Id. at 2-5 (citations omitted).)

Movant offers the declaration of defense counsel Richard Mazer to establish that the failure to elicit testimony from the fingerprint experts concerning the locations of four

_____

[2] Movant's reference to "three unidentified prints found on baggies inside the cereal box" is clearly erroneous. As movant correctly alleges earlier in the second amended § 2255 motion, "[o]ne of the unidentified latent prints was found on the Corn Flakes box and three unidentified latent prints were found on the newspaper used as packing material inside the Corn Flakes box." (Second Amended § 2255 Mot. at 3.) Attached to the motion as Exhibit D-1 is a copy of Felita Chapman's evidence report, reflecting that one latent print was found on Item no. 3, the corn flakes box, and three latent prints were found on Item no. 4, the newspaper in the box.

[3] Movant is referring to the request made by one of his trial attorneys, Mr. Chesnoff, after he completed his cross-examination of Ms. Hummell. In this regard, attorney Chesnoff stated, "Your Honor, I'm going to ask if we can get Ms. Chapman back, because when I was trying to ask her the questions about the identifications and –." (RT at 437.) The trial court interrupted counsel to tell him he could bring Ms. Chapman back. (RT at 438.)

1  unidentified latent prints found on and in the cereal box, and the subsequent failure to include

2  that information in the parties' stipulation, was not the result of a tactical decision and was in fact

3  contrary to the attorneys' intentions.  Movant also cites (1) defense counsel's statement to the

4  trial court that the parties' stipulation would identify where Chapman found all twelve latent

5  prints, including the eight unidentified prints, (2) Mr. Chesnoff's assertion, upon hearing the

6  jury's question concerning latent prints on the plastic bags inside the cereal box, that he had

7  elicited testimony that unidentified latent prints were found inside the cereal box, and, (3) Mr.

8  Chesnoff's argument to the trial court, after discovering that he had not elicited testimony about

9  unidentified latent prints inside the cereal box, that the jury should be given an answer informing

10  them of such evidence.  (Id. at 7-8 (citing RT at 437, 983, 991, 993, 995, 997, 1000, 1004).)

11         Movant argues that advising the jury of the precise locations of the prints found

12  on the packaging for the drugs was important to, and consistent with, the defense team's theory

13  of defense.  Movant contends that the error made by defense counsel in the present case is the

14  same unreasonable error made by defense counsel in Mak v. Blodgett, 970 F.2d 614, 618-19 (9th

15  Cir. 1992), in which the Ninth Circuit found deficient performance where the defense attorneys

16  did not make a conscious decision to omit mitigating evidence and there was no risk of damaging

17  rebuttal evidence.  Movant maintains that his counsels' failure to follow through with their plan

18  to elicit the important facts regarding the location of the unidentified prints was a serious error

19  that fell below the standard of care required of criminal defense attorneys.

20         Movant argues that he was seriously prejudiced by trial counsel's errors because

21  the defense theory of the case was that (1) movant acquired large sums of cash through gambling,

22  (2) the testimony of Britton Flemons was not credible, (3) the drugs found in movant's maroon

23  truck belonged to Flemons, (4) Flemons or someone else put the drugs in the cereal box in

24  movant's Blazer, and (5) the baggies in the cereal box in the Blazer matched the box of baggies

25  found in the house where Flemons resided.  Movant contends that the jury's note and its verdict

26  show that the jury rejected Flemons' self-serving testimony and relied on the incomplete

17

1  fingerprint evidence to find movant guilty of Count One but not guilty of Counts Two and Three.

2  Movant reasons that the jurors, upon receiving a non-responsive answer from the court to their

3  question about unidentified prints on and inside the cereal box, "were left with the albeit

4  inaccurate knowledge that only one fingerprint, Ference Lang's, was found inside the Corn

5  Flakes box"[4] and on the basis of that information convicted movant of the count involving the

6  cereal box but acquitted him of the counts involving evidence where his prints were not found.

7  (Second Amended § 2255 Mot. at 9-10.)  Movant characterizes the jurors' question as

8  demonstrating that they knew there were eight prints that did not belong to movant or Flemons

9  and they "wanted to know whether any of those unidentified prints was inside the cereal box

10  where the drugs were stored" because the jurors were "obviously . . . concerned with whether

11  there was evidence that someone other than Ference Lang packed the baggies into the cereal

12  box." (Id. at 10.)  Thus, movant argues, if defense counsel had presented evidence concerning

13  the location of the unidentified prints, as they intended to do, a different result would have been

14  reasonably probable.  Movant concludes that given the importance of the fingerprint evidence,

15  the prosecution cannot prove that counsel's error was harmless beyond a reasonable doubt.

16  IV.  Discussion

17          Respondent contends that movant has failed to show that his trial attorneys were

18  deficient in failing to clarify the fingerprint evidence and that, if the attorneys were deficient in

19  this regard, movant has not demonstrated prejudice.  The court agrees.

20

21          [4]  The record does not support movant's contention in this regard.  Rather, the jury was
presented evidence that one identified fingerprint, Ference Lang's, was found inside the cereal
22  box.  The jury also had before it evidence that eight unidentified fingerprints, none of them
Lang's, were found on the 72 pieces of evidence that were examined by fingerprint technicians.
23  The jury was not presented with any testimony reflecting the exact location of the eight
unidentified fingerprints found on the 72 pieces of evidence reviewed by the technicians.
24  Therefore, the jury could have inferred that some, all or none of those eight unidentified
fingerprints had been found inside the cereal box.  However, under no circumstances could the
25  jury have been informed that any of the eight unidentified fingerprints were found on the baggies
containing cocaine inside the cereal box because such was not the case.  Only Lang's fingerprint
26  was found on one of those baggies.

1    On cross-examination of fingerprint technician Felita Chapman, attorney Chesnoff

2  elicited her testimony that she examined numerous items of evidence for fingerprints and found

3  only twelve latent prints.  (RT at 415-20.)  On re-direct, Ms. Chapman agreed that she had

4  examined 72 items of evidence.  (RT at 421.)  On recross-examination, Mr. Chesnoff elicited

5  Ms. Chapman's testimony that there is no way to tell when a fingerprint was left on an object

6  and, with regard to a plastic bag, whether a fingerprint "was put there when someone was

7  wrapping their lunch or wrapping crack cocaine."  (RT at 421-22.)  Hummell also testified on

8  cross-examination that (1) she had examined twelve photographs of latent prints submitted by

9  Ms. Chapman for comparison; (2) she had identified one of the twelve latent prints as Ference

10  Lang's and three as Britton Flemons';  (3) there is no way of determining when a print was made

11  or the circumstances under which it was made, and (4) the twelve latent prints included prints

12  that belonged to people who had not been identified.  (RT at 431-35.)

13    During the defense case, attorney Chesnoff presented the parties' stipulation

14  regarding fingerprint evidence to the jury.  (RT at 649.)  He indicated to the court, in front of the

15  jury, that the stipulation had been "entered into to avoid having the fingerprint people come

16  back."  (Id.)  Mr. Chesnoff explained to the jury that they should treat the following facts as

17  having been proved:

18    Identification technician Penny Hummell made the
     following fingerprint identifications in this case:

19

20    The left index finger of Ference Lang was positively
     identified on the bag containing Government Exhibit Number 65,
     which was found inside the corn flakes box of the 1983 Chevy

21    Blazer at 2061 Hudson Street on November 3, 1993.[5]

22    The right middle finger of Britton Flemons was positively
     identified on a Ziploc baggie which was found in the 1967

23    orange/red Chevy parked in front of 204 Cookingham way.

24

25    [5] Government Exhibit Number 65 was one of the small baggies found inside a large
   plastic bag in the corn flakes box.  The small baggies were moved into evidence during the

26  testimony of Detective Brown on April 30, 1996.  (See RT at 133.)

1       The left ring finger of Britton Flemons was positively
identified on a box of sandwich bags and on a glass test tube which
2    was found in the northwest bedroom of 204 Cookingham way.

3       The eight remaining latent prints found in this case were
negative to both Ference Lang and Britton Flemons.  No other
4    positive fingerprint identifications were made on the items
examined in this case.

5

6    (RT at 649-50.)

7       The record demonstrates that defense counsel ensured that the jury in movant's

8    case was made aware of the following facts:  a large number of items were obtained during

9    searches at three locations on November 3, 1993; more than seventy items were examined by

10   government technicians for fingerprints; a total of twelve latent fingerprints were found on the

11   items examined; the single fingerprint identified as Ference Lang's was found on a small plastic

12   baggie inside a larger plastic bag in the cereal box hidden in Lang's Chevy Blazer in the locked

13   garage at the residence of Lang's girlfriend; Lang's fingerprint was located across the flap on the

14   outside of the baggie; three fingerprints on the evidence were identified as Britton Flemons'; one

15   of Flemons' fingerprints was found on a Ziploc baggie in the orange/red Chevy in which

16   Flemons was seated when the search warrant was served at 204 Cookingham Way; the other two

17   fingerprints identified as Flemons' were found on the box of sandwich bags and the glass test

18   tube both found in the residence at 204 Cookingham Way; eight fingerprints found on the items

19   of evidence examined by technicians were not identified.

20      It is not at all evident that defense counsel committed any unprofessional error at

21   all by failing to elicit testimony or stipulate to facts concerning the precise location of the eight

22   unidentified latent fingerprints.[6]  Movant relies in large part on the jury's note during

23

24     [6]  Movant's trial counsel have submitted declarations in which they both state they had
intended to present to the jury evidence that of the eight unidentified fingerprints, one was found
on the outside of the cereal box and three were found on the newspapers inside the box and on
25   top of the three large plastic bags containing the 45 smaller baggies of cocaine base.  (Second
Amended § 2255 Mot., Chesnoff Decl. at 2-6 and Mazer Decl. at 2-3.)  The court takes counsel
26   at their word that they intended to introduce such evidence.  However, that does not mean that

1  deliberations inquiring about any other fingerprints on the plastic bags inside the cereal box in

2  arguing that counsels' failure to introduce evidence regarding the unidentified fingerprints was an

3  unprofessional error of a critical nature.  The court is completely unpersuaded by this argument.

4       The jury note did not reflect any juror concern about the location of all

5  unidentified fingerprints or even all unidentified fingerprints on the cereal box and the

6  newspapers inside.  Rather, the note posed only the following, very specific, question:  "Was

7  [sic] any other finger prints found on the plastic bags that was [sic] in the corn flakes box?"

8  (Clerk's Record, Document #178; RT at 983.)  After discussing the note with counsel, the court

9  responded to the jury as follows with regard to fingerprints:

10      Were any other fingerprints found on the plastic bags that
   were in the corn flakes box?

11

12      Now a stipulation was read to you.

13      And the parties agree that I may reread it, correct?

14      Mr. Krotoski:  Yes, Your Honor.

15      Mr. Chesnoff:  Yes.  Thanks, Judge.

16      The Court:  There are two sentences that deal with what a
   stipulation is.  I'm going to skip that.

17      Identification technician Penny Hummell made the
18 following fingerprint identifications in this case:  The left index
   finger of Ference Lang was positively identified on the plastic
19 baggie contained in Government Exhibit Number 65, which was
   found inside the corn flakes box of the 1983 Chevy Blazer at 2061
20 Hudson Street on November 3, 1993.

21      The right middle finger of Britton Flemons was positively
   identified on a Ziploc baggie which was found in the 1967
22 orange/red Chevy parked in front of 204 Cookingham Way.

23 /////

24 _____

25 they committed an unprofessional error in failing to do so, anymore than would their failure to
   ask any other inconsequential question of a witness that they intended to pose but forgot.  This is
   because the Sixth Amendment guarantees a criminal defendant effective, albeit not perfect,
26 representation by counsel.  <u>Strickland v. Washington</u>, 466 U.S. 668, 690-96 (1984).

1
2
> The left ring finger of Britton Flemons was positively identified on a box of sandwich bags and on a glass test tube which were found in the northwest bedroom of 204 Cookingham Way.

3
4
> The eight remaining latent prints found in this case were negative to both Ference Lang and Britton Flemons. No other positive fingerprint identifications were made on the items examined in this case.

5
6
7
> Other than the information in the stipulation, there was no evidence introduced as to where, among the 72 exhibits examined, the remaining unidentified prints were found.

8
(RT at 1009-10.)[7]

9   The jury wanted to know whether "any other fingerprints," i.e., other than the

10  single print identified as movant's, were found on the plastic bags base cocaine inside the cereal

11  box hidden inside the engine compartment of his car parked in his girlfriend's garage. There

12  were 3 large plastic bags in the cereal box, and inside those plastic bags were 45 small plastic

13  bags containing various quantities of rock cocaine. (RT at 114-17, 122, 133-34, 262-63.) The

14  only print found anywhere on the 48 plastic bags inside the cereal box was Lang's left index

15  fingerprint on a small plastic baggie containing an ounce of rock cocaine. (See Second Amended

16  § 2255 Mot., Ex. D; RT at 409-12, 415-17, 420-21, 428-30.)

17  Had defense counsel presented the evidence that movant now claims was so

18  critical, the answer to the jury's question would have simply been "No, no fingerprints other than

19  defendant Lang's were found on the plastic bags inside the corn flakes box." (See RT at 997-99.)

20  Such a response would have served, as did the rest of the evidence admitted at trial, to implicate

21  Lang directly in the possession with the intent to distribute the cocaine base found in his car.

22  Therefore, it is simply not reasonably probable that the jury would have found movant not guilty

23

24  _____

[7] After addressing the jury's question about fingerprints, the trial court responded to a
25  subsequent jury question about articles found in Lang's maroon truck. (RT at 1010-11.) The court then indicated to the jury that the court and counsel were there if the jury had any more questions. (RT at 1011.) Lunch recess followed, and at 4:15 p.m. that afternoon, the court
26  received a note that the jury had reached a unanimous verdict. (RT at 1011-14.)

of possession with the intent to distribute the cocaine base found inside the Chevy Blazer on

November 3, 1993 if the jurors had known that no fingerprint other than his was found on any

plastic bag in the cereal box.

Nor is it a reasonable probability that the jury would have found movant not guilty

of that charge if they had known that one unidentified print was found on the cereal box and three

unidentified prints were found on the newspaper inside the box covering the plastic bags

containing cocaine base, even though that evidence would not have been responsive to the jury's

inquiry. Unidentified prints on a cereal box and newspaper have little evidentiary significance

since such items are touched by various hands in the process of manufacture, sale, and consumer

use. Indeed, in his examination of the government's fingerprint witnesses, attorney Chesnoff

emphasized that fingerprints on such common objects may have been placed there innocently,

particularly on items such as cereal boxes, which have excellent surfaces for retrieval of

fingerprints. (See RT at 74.) In this regard, it was a prong of the defense theory that Lang's

single fingerprint may have been innocently placed on the plastic bag which was later found to

contain cocaine base. (See RT at 74-75, 928-29.)

Moreover, it is clear from the record that any inadvertent failure to present

evidence concerning the locations of each of the unidentified latent fingerprints certainly did not

prevent defense counsel from presenting the central theory of the defense theory during opening

statement and closing argument to the jury. The central theory presented in attorney Chesnoff's

opening statement was that the government's case was based largely on the testimony of

Flemons, who could not be trusted due to his criminal history, his previous perjury, and his

favorable plea agreement with the government. (See RT at 65-76.) Defense counsel's opening

statement includes but a few sentences referring to the issue of fingerprints and Flemons' alleged

access to both of movant's vehicles in which drugs were found. (RT at 73-75.) None of defense

counsel's assertions in his opening statement as to what the evidence would show, suggests that

the central defense theory depended on evidence that unidentified fingerprints were found on the

cereal box and the newspaper inside it.  (See RT at 73-75.)[8]  Rather, defense counsel emphasized both in his opening statement and closing argument that Flemons' three fingerprints were found "in a lot of dirty places," unlike the location of Lang's one fingerprint on an item as innocent as a sandwich bag.  (See RT at 74-75, 928-30.)

Attorney Chesnoff's closing argument also focused on the government's reliance on the testimony of Flemons.  (See RT at 917-26, 933-35.)  Again, Chesnoff emphasized the evidence that implicated Flemons as the perpetrator:  the fact that the baggies found at the Cookingham Way residence matched the baggies found in the maroon truck and in the cereal box; evidence that more than 70 items were tested for fingerprints and only 12 latent prints were found, of which 3 belonged to Britton Flemons "and were found on very incriminating evidence," i.e., on a box of baggies and a test tube, while the sole fingerprint identified as Lang's was found on the outside – not the inside – of one sandwich bag.  (RT at 923-24, 928.)  Mr. Chesnoff's closing argument also highlighted the testimony he had elicited from Flemons about knowing how to break into a car.  (RT at 346-47, 935.)

As noted, attorney Chesnoff's failure to mention in his opening and closing argument the unidentified fingerprints found on the outside of the cereal box and on the newspaper inside the box contradicts his after-the-fact contention that the location of those four unidentified fingerprints were crucial pieces of evidence and an important part of the defense theory.  The court finds that the omission of evidence concerning the location of the eight unidentified prints, particularly the four that were on the cereal box and the newspaper inside the cereal box, was at most a minor oversight by defense counsel and not an unprofessional error as

---

[8]  If such evidence was as critical to the defense theory as now claimed by movant, certainly counsel would have at least mentioned it in his opening statement.  Likewise, if such evidence was of a critical nature to the defense theory and attorney Chesnoff thought he had introduced it as he now asserts, certainly he would have mentioned that evidence in his closing argument to the jury.  Counsel's failure to do so, supports the conclusion reached by the court here that while counsel intended to introduce such evidence, it was not deemed to be of any great importance either by counsel or by the jury.

1   claimed by movant.  This is particularly the case in light of defense counsel's tactical decision

2    not to recall the government's fingerprint witness to testify as to the location of each

3   unidentified print.[9]

4              For all of these reasons, the court is not persuaded by attorney Chesnoff's

5   declaration to the extent he suggests that in retrospect the location of four unidentified latent

6   prints on the cereal box and newspaper "were an important aspect of proving [that] defense

7   theory," and that identifying the four prints on the box and newspaper was "crucial." (Second

8   Amended § 2255 Mot., Chesnoff Decl.)  Of course, trial counsel's tacit admission that his

9   performance was deficient "matters little."  Jennings v. McDonough, 490 F.3d 1230, 1243 (11th

10  Cir. 2007) (quoting Chandler v. United States, 218 F.3d 1305, 1315 n.16 (11th Cir. 2000), cert.

11  denied 531 U.S. 1204 (2001)).  See also United States v. Eyman, 313 F.3d 741, 743 (2d Cir.

12  2002) ("[T]rial counsel's admission that his performance was deficient is not dispositive."), cert.

13  denied 538 U.S. 1021 (2003).[10]  This is because the reasonableness of counsel's performance

14  must be evaluated, not in hindsight, but from the perspective of counsel at the time the acts or

15  omissions were made.  Jennings, 490 F.3d at 1243-44 (citing Strickland, 466 U.S. at 689).

16             The defense attorneys' conduct in this case reveals an aggressive defense at all

17  stages of the proceedings, and the trial judge recognized the quality of their performance.

18  (See RT at 609.)  In this regard, movant's reliance on the decision in Mak v. Blodgett is

19

20        [9]  The trial court repeatedly gave defense counsel opportunities to recall government
    witnesses, and defense counsel took advantage of such opportunities when deemed appropriate
21  by recalling Detective Brown twice and Britton Flemons once.  (RT at 612, 821, 839.)  The
    decision to submit a stipulation in lieu of recalling Ms. Chapman was tactical, perhaps motivated
22  by the fact that her testimony implicated Lang by identifying his fingerprint across the flap of the
    baggie containing cocaine base (RT at 411), and does not support a conclusion that the additional
23  fingerprint evidence was crucial to the defense.

24        [10]  For what it is worth, the court notes that attorney Mazer's declaration states only that
    defense counsel intended to introduce evidence of where the eight unidentified fingerprints were
25  found and that their failure to do so was inadvertent and not a tactical decision.  (Second
    Amended § 2255 Mot., Mazer Decl.)  Unlike attorney Chesnoff, attorney Mazer does not declare
26  that such evidence was an important part of the defense theory nor does he characterize it as a
    crucial piece of evidence for the defense.

25

misplaced.  Mak was a capital case in which defense counsel failed to present any mitigating

evidence regarding the defendant's background, family relationships, and cultural dislocations in

the penalty phase of the trial.  970 F.2d at 618-19.  As noted by the court in Mak, defense counsel

failed to present "important mitigating evidence in the penalty phase" and presented "no

humanizing evidence whatsoever to offset" the prosecution's portrayal of the defendant as a

killing machine.  Id. at 619.  Counsel's error was magnified in that there was no need to be

concerned about damaging rebuttal evidence and thus there was no risk in presenting the omitted

evidence.  Id.  Under those circumstances, it is not surprising that the court found such

performance deficient within the meaning of Strickland.  Id.  Here, in contrast, movant has not

shown that defense counsel's mere omission of the marginally relevant evidence regarding the

specific location of eight unidentified fingerprints rises to the level of that magnitude of

counsel's error addressed by the court in Mak.

Applying the strong presumption that counsel exercised acceptable professional

judgment in all significant decisions made in the case, the court concludes that defense counsel's

omission, in light of all the circumstances, was not outside the wide range of professionally

competent assistance.  See Davis v. Woodford, 384 F.3d 628, 642 (9th Cir. 2004) (calling of

witnesses irrelevant to the defense theory not ineffective); Jackson v. Calderon, 211 F.3d 1148,

1158-60 (9th Cir. 2000) (counsel does not render deficient performance by failing to have experts

limit their reports to exclude background information), cert. denied 531 U.S. 1072 (2001);

United States v. Quintero-Barraza, 78 F.3d 1344, 1351 (9th Cir. 1995) (holding that counsel's

oversight in failing to renew a motion for acquittal did "not rise to the level of Strickland

ineffectiveness" even though it subjected any appellate challenge to the sufficiency of the

evidence to a lower standard of review), cert. denied 519 U.S. 848 (1996); United States v.

Harden, 846 F.2d 1229, 1231 (9th Cir. 1988) (failure to call a relevant witness did not

demonstrate ineffective assistance of counsel in light of the evidence against the accused).

/////

1      Even if the court were to reach a different conclusion on the deficiency of defense

2  counsel's performance, movant has not affirmatively shown prejudice.  As explained at length

3  above, the location where the eight unidentified prints were found, or even evidence of the four

4  unidentified prints on the cereal box and the newspaper inside in particular, was not exculpatory

5  evidence.  As discussed <u>supra</u>, fingerprints of unidentified persons would be expected on such

6  common items as a cereal box and newspaper.  Defense counsel emphasized throughout the trial

7  that it is not possible to determine when or why a fingerprint was left on an item, particularly an

8  item with a potentially innocent use, such as a sandwich bag.  Unidentified fingerprints on cereal

9  boxes and newspapers are perhaps even more likely to have been placed there innocently.[11]

10      The undersigned finds no reasonable probability that, but for the omission of

11 evidence regarding the location of the unidentified fingerprints, the outcome of movant's trial

12 would have been different.  This conclusion is bolstered by the extensive evidence of movant's

13 guilt, wholly apart from his fingerprint on the flap of the baggie containing cocaine base that was

14 found in his car.  <u>See</u> <u>Fields v. State of Alaska</u>, 524 F.2d 259, 261 (9th Cir. 1975) (holding, in the

15 context of a <u>Brady</u> claim regarding fingerprints of unidentified persons, that unidentified

16 fingerprints of other persons would not have been exculpatory of the petitioner); <u>see</u> <u>also</u> <u>United</u>

17 <u>States v. Durgin</u>, 444 F.2d 308, 310 (9th Cir. 1971) (unidentified latent fingerprints on paper

18 wrapped around drugs in a suitcase in an automobile were not of obvious value to the defense in

19 light of the several reasonable and non-exculpatory possibilities for their presence and therefore

20 production by the prosecution was not required and a new trial was not warranted).

21      For all of the reasons set forth above, the undersigned finds that movant has not

22 established that trial counsel's failure to elicit evidence regarding the location of the unidentified

23 latent fingerprints constituted ineffective assistance or that movant was prejudiced by counsels'

24 performance in this regard.  The record reflects that movant received the fair trial guaranteed by

25 

26     [11] Indeed, defense counsel made a point of informing the jury that a cereal box provides
    an excellent surface for retrieving fingerprints.  (RT at 74.)

the Sixth Amendment.  Indeed, it appears that his two trial counsel turned in a rather startlingly-effective performance by obtaining his acquittal on two of the three charges set out in the second superceding indictment despite the significant evidence facing him.  Movant, having failed to demonstrate either substandard performance or prejudice, is not entitled to relief on his claim of ineffective assistance of counsel.

CONCLUSION

Accordingly, IT IS HEREBY RECOMMENDED that:

1.  Movant's February 5, 2001 second amended motion for relief pursuant to 28 U.S.C. § 2255 be denied; and

2.  The Clerk be directed to close companion civil case No. CIV S-00-0895 DLJ.

These findings and recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within **fifteen (15)** court days after being served with these findings and recommendations, either party may file and serve written objections with the court.  A document containing objections should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to objections shall be filed and served within **ten (10)** court days after the objections were served.  Failure to file objections within the specified time may, under certain circumstances, waive the right to appeal the District Court's order.  See Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: October 25, 2007.

Dale A. Drozd
_____
DALE A. DROZD
UNITED STATES MAGISTRATE JUDGE

DAD:13
lang0472.257

28